Nash, J.
 

 These proceedings have been instituted under the 41st Sec. of the 111th Ch. Rev. Stat. ’ The slave was arrested, under a warrant duly issued by a single magistrate. The offence or misdemeanor, charged therein, was for being found in the night time, secreted under the bed of the prosecutor, and, to evade any charge of a serious nature, as to his intentions, that he falsely made charges to excuse his being there, ^highly slanderous to the character
 
 *374
 
 of a female of the family, The precept was properly returned, and the magistrate adjudged, that the slave should be punished by receiving a number of lashes. From this judgment, the owner ot Bill appealed to the County Court. There, a motion was made, in behalf of the slave, that the charge should be tried by a jury. This was refused by the Court, and judgment being pronounced upon Bill, his master praj'ed an appeal to the Superior Court, which was allowed. In the Superior Court, the presiding Judge dismissed the appeal, as having been improvidently granted; and ordered a
 
 ■procedendo
 
 to issue to the County Court. A rule was then obtained upon the Attorney General, to show cause why a
 
 certiorari
 
 should not issue to bring up the proceedings; which, upon argument, was refused, and the owner of Bill appealed to this Court.
 

 His Honor committed no error in refusing to issue the writ required. There is no doubt, but that it was within the Judicial power of the Court, to have ordered a
 
 -certior-ari.
 
 "Where the proceedings of an inferior tribunal are not according to the rules of the common law, a party conceiving himself aggrieved by its decision is entitled to a
 
 cer-tiorari ex debito justifies,
 
 to bring them up to be reviewed in the matter of law, as in other cases, on a writ of error. But in such cases the writ is never granted, except for an error in law. The allegation on the part of the owner of the slave, is, if the law allowed no appeal, in such a case, from the County, to the Superior Court, then, from necessitjj he was entitled to the writ forwhich he asked. That is true
 
 sub modo.
 
 Where an appeal is granted in a proper case, from a inferior
 
 to
 
 an superior tribunal, it takes up the whole cause in general, and the trial is
 
 de novo.
 
 If the party complaining has been denied this right where it exists, or deprived of it by accident or fraud, or inability to comply with the requirements of the law, he may have his whole case reviewed by a
 
 certiorari,
 
 both as to matters of law
 
 *375
 
 and íact; and where the right of appeal is not allowed there, the aggrieved party is still entitled to have his case revised by a superior tribunal; but only on points of law. If the County Court erred in granting the appeal to the Superior Court, the latter tribunal had no jurisdiction over the cause, and the appeal was properly dismissed: and if the County Court committed no error in those proceedings, and that appeared on the record, as shown by the applicants, his Honor rightly refused the
 
 certiorari.
 
 It is necessary then to look to the various Statutes regulating proceedings of this kind. The acts of our Legislature on the subject of slaves, are mostly police regulations. Justice Blackstone, in his 4th vol. p. 162, defines public police and economy to be the due regulation, and domestic order of the State, whereby the individuals of the State, like members of a well governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood and good manners. As early as 1741, the Legislature found it necessary to legislate on this subject, and from time to time, down to the present, laws regulating the conduct of slaves have been made. It is unnecessary to trace out this legislation, step by step, but it is gratifying to remark how its spirit has kept pace with the progress of the times, and if, on our Statute Book, some few acts are retained, which we could wish to see abandoned, still, the spirit of our modern legislation is to moderate the evils of slavery, and to protect the safety, and the rights of the slaves themselves. The act of 1741 secured to the slave the right of appeal, through his master, irom the judgment of a single magistrate to the County Court, when tried for the offences therein set forth; and that act has several times been re-enacted. In 1783, the act was passed, under which the proceedings are had, in this case, and it is re-enacted in the revisal of 1836. It provides that when any slave shall commit any misdemeanor or offence, which is not by law declared capital, and which,
 
 *376
 
 in the opinion of the Justice or Justices, before whom such offending slave may be carried for examination, shall appear to be of so trivial a nature, as not to deserve a greater punishment, than by that act a single Justice of the Peace is empowered to inflict, such Justice shall and may, &c., and proceed to the trial and pass judgment, which shall not extend beyond forty lashes; Rev. St. 1S36, ch. Ill, S. 41; but may be as much less as shall appear right and proper to the Magistrate. In the defence, it is said, the words used in the act are too vague and indefinite to give any jurisdiction to any Court — that it clothes the Magistrate with the power to make, and declare the law. To a certain extent it does so, and must do so from the very nature 'of the case, the law was providing against. It was utterly impossible to specify, and enumerate all the actions of a slave, as a member of society, which would violate the domestic order of the State, and which, if tolerated, would, and must inevitably, lead to higher, and worse offences. Without, therefore, making so futile an attempt, it is left to the sound discretion of the Justice, before whom tha offence is brought. And there is humanity in the act. Standing in the relative position, which the white man and the slave occupy, there are and must be a great variety of the acts of the latter, which cannot, and ought not, to be suffered, and which could be highly calculated to exasperate. If the law did not provide a remedy in such cases, the consequence would be, that individuals would take, what they would think justice, into their own hands, and it requires no stretch of imagination, to see where such a state of things would end. By the act we are considering, the execution of its provisions is confided to the magistracy of the country, and where could it be more appropriately placed ? Scattered throughout the different counties, there is scarcely a neighborhood, where one or more is not ■ to be found. ' Justice is speedily and cheaply administered^.
 
 *377
 
 and the peace and good order of society preserved. But it is sufficient for us, that, since the passage of that act, many sessions of the Legislature have been had; it still is the law of the country, and has been repeatedly called into action It is further said, that there is no act specified in the warrant, which amounts to a misdemeanor or offence, m a legal sense. The warrant charges, that, at a late hour of the night, Bill was discovered concealed under the bed of Thomas Thompson, with an intent to commit some felony or violence, and upon being so charged, in order to avoid it, he “impudently and insolently” made charges, injurious to the character of a young lady living in the house1 It is believed that the action of the magistrate is sustainable upon each of the grounds set out in the precept. Is it no violation of the public police of the country,- under the definition given by Justice Blackstone, for a negro slave to be found secreted under the bed of a white man, at a late hour of the night ? is it no offence for a slave, “ imp udently and insolently,” to bring charges against a white female, injurious to her character ? If a white man were to do such an act, and to make such a charge, it would sustain an action for damages. The word “insolently” used in the precept has been criticised. Worcester defines insolently, to be any thing said or done rudely, and. insolent, its root, to be, rude, saucy, insulting, abusive, offensive. What acts in a slave towards a white person will amount to insolence, it is manifestly impossible to define — it may-consist in a look, the pointing of a finger, a refusal or neglect to step out of the way when a white persoii is seen to approach. But each of such acts violates the, yules of propriety, and if tolerated, would destroy that subordination, upon which our social system .rests. They must be restraineJ, and no where can the punishment of such offences, with so much propriety, be placed,, as with the Justices .of the Peace , and much, in the enforcement
 
 *378
 
 of the law, must be left to their sound discretion. The warrant then justified the magistrate in taking cognizance of the charge, and the- appeal to the County Court was properly taken; Act of 1842, ch. J. S. 1; and that Court was guilty of no error in refusing a jury
 
 trial to
 
 Bill. There is nothing in the act granting the appeal, which varied the trial in the County Court, from that before the magistrate, and there is nothing in it authorising an appeal 'to the Superior Court.
 
 Hawkins
 
 v.
 
 County of Randolph,
 
 1 Mur. 118,
 
 Atkinson
 
 v. Foreman,
 
 2
 
 Mur. 55.
 
 Wood
 
 v.
 
 Wood,
 
 1 Car. L. Rep. 513. In each of these cases, the Legislature, by subsequent acts, granted appeals, from the County to the Superior Court. We have thus seen that the acts charged against Bill, if true,- subjected him to be dealt with under the 41, sec. Ill, ch. of the act of 1836, that the magistrate was justified in his action under it, that the appeal to the County Court was properly taken, and that the latter tribunal committed no error in law, in refusing him a trial by jury, that the appeal to the Superior Court was improvidently granted, and that his Honor acted properly in dismissing the appeal and refusing the certiorari.
 

 Per Curiam. This opinion will be certified to the Superior Court of Martin.